Good morning, Your Honor. My name is Marion Rosner. I'm a senior partner at the firm of Wolf Hopper in New York, and I represent the appellant. Could you keep your voice up, please? Yes. I represent the appellant, Seth Huberman, on this appeal. I'd like to reserve three minutes of my time for rebuttal, if that is okay with you. All right. So keep your eye on the clock. The time is running down. Okay. Okay. Let's get to it. The burden on defendants on summary judgment is to produce sufficient evidence that will convince the court that there's no issue of fact for the jury to decide, especially on slander. Defendants here not only did not meet that burden, they didn't even try. Well, you can do summary judgment in different ways. One way you can do it is you can say the plaintiff has no evidence. Well, I think that a review of what the plaintiff's evidence was was sufficiently strong and suspicious to raise a question to shift the burden to the defendants to get summary judgment. There's no question that there were transactions that were untaken by Target that simply had no basis in the accounting rules, no basis with missing documentation, no basis in any way to explain. Even when the plaintiff or the party that's responding to the summary judgment motion produces some evidence, the court could say, well, that evidence is, you know, nothing more. What did the Supreme Court say? Nothing more than a scintilla of evidence. And a reasonable trier of fact could never find the facts as put forth by the lobbying party. Well, let me give you an example. It would help me if you would just kind of highlight the evidence you believe shows that there is a true, genuine issue of fact here. I can just talk about two transactions, which I think will leave you with the clear understanding that there's a tribal issue of fact. One was the Laredo, Texas, transaction where they came in and they found obsolete inventory. Even given the defendants the benefit of the doubt that they didn't have to take a reserve on that, when Colin Dial ordered in his reply affidavit that the inventory be replaced in that warehouse, he made it seem like a simple transaction, put the talon zippers back in the warehouse to show that we have inventory to support our collateral. But what never got explained is this memo which referred to a fire drill, an instruction from the top of TACIT, this is an emergency. Get that inventory to the warehouse, but remove all the tags, all the identifying aspects so that nobody can tell where and when that inventory came from, whether it was obsolete, whether it qualified or not. That is a highly unusual business decision to make. I mean, the name of this company is TAGIT, is tags. It even produced tags in discovery. But to remove intentionally the tags so that the auditors would not be able to identify or audit or determine the obsolescence of that inventory is a highly suspicious transaction, which in and of itself was never explained at all. But what does that show? What does that show in terms of the CITER and the securities violations? Well, you have to remember that they were relying upon UPS as their lender to lend them money based upon their inventory. And they had certain requirements that that inventory be of a certain kind and be not over-concentrated with related parties and so on and so forth. So when they moved the inventory that had to be, to be counted and eligible, had to be in the United States from Mexico, and they moved in zippers to do what is contrary to their reasonable mode of operation and remove the tags, is a very suspicious, unusual transaction. So if you were making, so your argument is that that shows that they had knowledge, that they knew that there were problems with accounts receivable or whatever, and they were trying, and they suppressed information. Absolutely. Why else would they do that? I'm just asking. I mean, you know, if you read from the memo, it says in capitals, this is an emergency with four explanation points. The boxers should only have the item numbers, no dates, no POs, no other markings. This is urgent. Please get this started now. This is urgent. Now, why would you do this except to disguise the inventory to make it impossible to determine whether the inventory could possibly be used as collateral? So how does this all add up to the, to the, to the, is this related to the 10Qs or the public announcements or what? Well, this is related to their inventory and their. Which is related to. Related to their other financials. But there's another transaction, I think, that is even more open and shut, and that's the Coats transaction. This company took. The thread. The thread. This company took $2.6 million off of its books and made it disappear. It's gone. And it claims that it was blessed by Seidman. I'm sorry. It claimed what? It was blessed by Seidman, who was the auditor, who eventually quit on them. But the $2.6 million worth of inventory was trendy thread, not saleable. By counting those alone, you had to mark it down to what it was, and you couldn't keep it on your books at level, at full price. But worse than that, you can't simply by giving back, giving the auditor shipping documents. I shipped this to you, therefore I don't own it anymore. It doesn't work like that. For me to give it to you and to take a title pass, you have to give me a credit memo. And you have to show me that you take ownership of that, you know, material before a title will pass. That's the only way it gets off your books. Now, they never gave Seidman a credit memo. Seidman asked for it. They never gave it. It was never produced here. It was never produced by Seidman. I would say to you that if it was a legitimate transaction, they would have come in to us, waiving that agreement. Here's the redying agreement. Here's the credit memo. Here's, you know, everything you need to make that transaction kosher. No response, no nothing. So this also shows that they knew that they had – that their receivables were overstated? Is that – or that they're – It had two effects. It was very convenient. It had two effects. One, it allowed them to report a profit for the third quarter of 2004, where otherwise they would have had a loss. Okay. And also it reduced their accounts payable by $2 million, making it seem like they were getting their accounts payable collected faster than they were. One of the things you complained about at the summary judgment was that you didn't have sufficient time to really analyze the discovery that you got. Unfortunately, that is – that's true, you know. Did the district court judge ever rule on your 56-F request? He denied it. No. He never ruled. He never ruled on it. He had the evidentiary objections. He never ruled on those. He never ruled on that either. No. He apparently denied your discovery request implicitly by just granting summary judgment, but he never formally denied it. I think that's fair. I mean, I'll say one more thing about codes because I think that's a nail in the coffin. Aside from Seidman not having the credit memo it needed to take the title off the books, eight months later there was Seidman back again with a memo saying this $2.7 million needs to be investigated. We need a paper trail. Was it returned to codes? Why are they questioning it if they got the shipping documents showing that it was returned? And then why, a year later, when Singer comes in, do they look at it once again and decide that they are going to make them reverse it, put it back on their books, and take a write-off for it? It's just not a legitimate transaction. And we put in an affidavit of our own expert, accounting expert, which clearly said it didn't comply with GAAP. They didn't respond to it. They didn't put in an affidavit from an expert, from Seidman, from anybody. They just ignored it. I mean, the slip-and-slide response to discovery, the careful production of documents, like the hard drive coming two-and-a-half weeks before discovery, before that there were 500 boxes of documents filled with invoices, lunch receipts, tickets, buttons. Did you ask the district court judge to extend the discovery cutoff period? Yes, we did. And what did he do? He did it on an ex parte basis, which was the only way we could have done it in time. And he ruled there was no reason to do it ex parte denied. I see. So did the district court judge at St. Clair, based on the arguments, but his ruling was based on Scienter only. He did not reach all of these other issues. That's quite clear. That's absolutely correct. He ended up signing the order they submitted, though, that adopted everything that they had. Well, he kept doing that all the time. I mean, he did it on class. He did it on summary judgment. And he's asked them, counselor, prepare order. I will. Well, he didn't. He submitted the same order, or the court went to the same order that had been submitted prior to the motion, in which he said, okay, I grant on every ground you ever raised. And that was the order that was signed. I just want to make a suggestion to you if this case does indeed go further. I had my extern, who's a law student, go through all your evidence and put two columns, one side business transactions, other side by date, chronology, other side announcement and what it said. And it's a really helpful way to organize your evidence. And it does to me at least tentatively show circumstantial evidence that might be enough to defeat summary judgment. But if you had presented it that way, I think even to the district judge, you might have gotten a slightly different result. Well, I don't think so. Oh, I'm a judge. I am telling you, I'm giving you some good advice here. So you should just take it. I respect what you're saying. But put yourself in my position. I have been in your position, too. I was a securities litigator for 16 years. I have a week to respond to the summary judgment motion. I got the hard drive with the evidence you're talking about two and a half weeks before the end of discovery. It was a circus, taking depositions every day, analyzing the evidence every day, writing the summary judgment brief every day. You're absolutely right. It should have been organized differently. Was there time to do so? No. Well, Judge Real believes in kind of a rocket docket. Why? Why? Where was the ship going? All right. All right. We don't have to argue about this. You want to reserve some time, why don't we hear from the other side? I'm certainly going to be talking about the two transactions that counsel mentioned in her remarks and was a subject of questioning by Judge Paez. But before I do that, I'd like to talk about some of the other issues in the case. This case can't be resolved by the panel just reversing on CNTR, because we've raised both in the district court and in this court the issue of loss causation. Counsel can say that the judge didn't rule on loss causation, but the judge signed an order granting summary judgment on loss causation. And even if he did not, certainly this court could affirm on the independent ground of loss causation. I'd like to start with that briefly. That's discretionary, isn't it? It is discretionary, but I don't see how the court could say the judge didn't rule on the issue when he signed the order granting summary judgment on that ground. It's questionable to me, in my mind, whether he actually ruled on it, given the lack of any meaningful rationale put forward in his decision. Well, I've had certainly plenty of experience with judges and tried to divine why it is they did what they did. And certainly when we review what judges do, normally we look for something meaningful to review, and there's not much here. I was going to say I appreciate that this is not a perfect case where you have a 20-page opinion that lays everything out. On the other hand, he did handwrite findings on the separate statement. Well, there are no findings. You don't make findings in summary judgment. There's no such thing as findings. I'll accept that, Your Honor. He interleviated the order to indicate some of his thinking. Not much. I would say. He kept just saying there's no admissible evidence to the contrary. That's correct. That's about the only thing he said, and he said it several times. He might as well have had a stamp. Well, I guess he doesn't have that stamp, Judge Fletcher. Maybe he should if he's going to rule like this. I would like to address the merits of loss causation, because I think even if this were viewed as a discretionary for the panel to consider, this is certainly a case that summary judgment would be proper on loss causation. And we certainly briefed it. It wasn't a surprise. All that was put in on loss causation in this case are press releases and a stock chart. And I don't see how anyone could conclude that that was sufficient to show that the number of things said in the release, of all those things, change in inventory reserve caused a very large stock drop. That's normally the province for an expert analysis. The imperial credit case goes even a step further and says when you have an expert analysis, you still have to look at it for purposes of judgment, summary judgment. I suppose your opposing counsel argued they didn't have time to get an expert analysis, given how quickly this thing moved forward. And I'd like to address that head on. Loss causation is not something that you would need discovery from the defendant to do. It's a market analysis. Typically a sophisticated regression study is done by an expert. In most securities cases these days after Dura, a loss causation expert is retained at the very beginning of the case and indeed assists with the preparation of the complaint to make sure it's Dura compliant. In the many months that they had, they certainly could have put forward that kind of evidence. I'd submit they're effectively asking for a presumption of loss causation in this case. No, they're not. You know, all it is is you're probably correct. It's probably best if the case gets to trial that they have an expert. Ideally they should have an expert. It would be great if they had an expert on loss causation here, but I don't see anything in the statute, in the federal rules, or in Dura, or anything that says that they absolutely have to have. And that's not our position, Judge. Our position is that in this case, because of the multifaceted nature of the announcements and the things that are going on in the industry, which are in the announcements, the market is shifting from Mexico to Asia, and people are assessing the garment industry, they need to be able to separate that out for purposes of proving causation and damages. Does the expert need to know anything at all about the company? That's not a question I've given much thought. I would think they would need to know something about the company, yes. But they wouldn't necessarily need our accounting record. What was in that disk, or whatever it was you turned over towards the end of discovery? Lots of e-mails. But most of those e-mails appear in the 500 box of documents that were produced before that. I mean, it's hard to say, to come in an oral argument in the Ninth Circuit and say, here's the list of the 500 boxes, but there was a massive amount of data. I wanted to address one remark that counsel made, calling this a circus. The reason it's a circus is because the counsel made a choice in this case. They made a choice to try to live with the schedule and to jam all the discovery. Well, my impression was is that when you, you know, under Rule 16 in the district court, there's a meeting of counsel, and they work out a schedule, and then they submit it to the district court. And, you know, most of the time the district court judges go along with that. And I know you were a district judge, and so. And I generally went along, and, you know, Judge Wardlock can speak for herself, but, you know, when counsel worked out a schedule that seemed reasonable, you know, I'd go along with it. But Judge Reel here whacked off about three months. He did. And at that point, if counsel for the plaintiff thought that rather than move the case to trial rapidly, which is often in the plaintiff's interest, that they would rather have those extra three months, they could have brought a motion. And they didn't. They waited month one, they didn't bring a motion. Month two, they didn't bring a motion. Month three, they didn't bring a motion. And I don't think that I would hope the panel wouldn't be prepared to rule that chopping a couple months off the discovery schedule would be an abuse of discretion. Well, you know, that's not here before us, technically, I don't think. She did ask for it. She submitted an ex parte application to extend the discovery cutoff. Right. If I'm not mistaken. After having made the strategic choice to try to live with the schedule at the last minute. Certainly, it burdened us on the defense to have to deal with an abbreviated schedule as well. But we did. We met our obligations. The early meeting of counsel, we made our disclosures. Never was there a motion filed that the disclosures were inadequate or improper in any way. I'd like to talk about class certification as well. Because that is, and I certainly, I've got eight minutes left, so I'm going to get to the two transactions and see But I don't want class certification to just be lost in the hurrah. That's the answer. It's not lost. Thank you, Your Honor. I know it's an issue there. Yeah. I don't, I actually don't see why Mr. Huberman wasn't a typical class representative. The key fact that matters is that Mr. Huberman purchased stock after the announcement of negative information about the company in contradiction to what the rest of the market folks were doing in the stock. And that brings up the issue of whether he relied on the market or he was relying on other information. It didn't have to be inside information. Which purchase are you talking about and which negative information? Because I have a handy-dandy timeline, so I want you to tell me specifically. I will, just if you bear with me for one second. It appears after the stock had declined by 50%, it's the transaction that's reflected in the excerpts of record at 2307-08. What's the date? I don't have the date in front of me, Your Honor. And I'd prefer not to dig through the record at this moment. But I will if it will assist you. Okay. Tell me the ER again. It's 2307-2308. Okay. The point being that there's a question of whether he's relying on the market or on tips. And they don't have to be insider tips. For the plaintiff to prove his case in a class manner like this, he's going to be relying on the fraud in the market doctrine. And if we show that he did not rely on the market, then he's going to lose. It's his burden to show reliance. And the trial judge, I think appropriately, decided that those issues, which were unique to Mr. Huberman and wouldn't have been true of Joe Smith in the class, posed a risk to the class, such that a class should not have been certified at that point in time. So what you're talking about is the allegation that he was offering on the basis of a passed-on tip from an insider? We don't know for sure why he bought after the market went down as opposed to when it went up, when the other people were buying in the market. That discovery had just begun in some ways. We had our theories about it. We had deposed Mr. Huberman, and there was testimony from some of these hedge funds people, and we prepared to cross-examine them. There are numerous witnesses. And the judge said, well, this is going to turn the trial into somewhat of a sideshow. And it's certainly an appropriate topic for defense inquiry. So better to not certify the class due to his typicality issues. But that sounds like not certifying the class based on suspicions that he might not be typical rather than on a showing or some proof that he's not typical. Well, we had the showing, an evidentiary showing, of his acting adverse to the rest of the market in terms of his purchases. Yeah, but that doesn't strike me as enough. You then have suspicions as to why he might have done that, but you don't have proof. Well, there's enough proof. Well, go ahead. Answer Judge Fletcher's question. I was going to say there was enough proof for us to lead the trial judge to believe it's going to be an issue in the case. He didn't have to conclusively establish that we were going to be right about that issue, just that that was going to be an issue that would take up time in the case. The judge also ruled that the plaintiffs had not met their burden of showing their ability to rely on the fraud and the market doctrine due to the absence of showing an efficient market. So is it your position that the American stock exchange is not an efficient market? It's my position that stocks traded on that exchange, when looked at case by case, might not be efficient, and particularly at different times. The market for all stocks at all times in the American stock exchange may not be efficient. That is our position. And the exchange is – And it's the plaintiff's burden to prove that it's efficiency as to this particular stock? Yes. And typically courts look at the five camera factors, and generally there's evidence, often including expert evidence, about those factors at class certification, none of which was present here. Now I'd like to pick up the Sienter issue with respect to both transactions. I'd initially point out that both transactions have to do with – that are referenced essentially have to do with inventory, and they say nothing about accounts receivable or other aspects of this case. And in determining the Sienter, I think the court, if they were to look at it in a fashion different than the district judge, would need to consider it on a defendant-by-defendant basis and with respect to each of the different claims that were in the case. Why does it say that there's a memo from a lower-level manager about inventory at Laredo? What does that say about Rhonda Ferguson, who's an individual defendant in this case? What does that say about her Sienter? What does that say about Mark Dine, who's the chairman of the board, doesn't work for the company. He has his own business. Why does that prove his Sienter? How many key people were there in this company? A number. How many? Key people? Yeah. At least a dozen. A dozen. At least. At least a dozen. And they had locations in North Carolina, Mexico, Guatemala, Asia, and here in California. It's pretty much a family business, right? It was a family business when it was started, but it became a public company and grew. It was still pretty much controlled by the family, correct? Well, I'd say there's differences of opinion about that, but they're not material for our purposes here, I think. It was a $100 million business at its height, so it wasn't in a garage. No. By the same token, it's not Walmart. It's a relatively small public company that grew over time and, like many companies, experienced growing pains and issues like that. With respect to the inventory at Laredo that was referenced by counsel, I'd like to point out that at the time, the company had something like a $6 million reserve. If all of the inventory in the Laredo warehouse had been obsolete, where's the evidence that that would have said that that reserve should have been $7 million rather than $6? Because that's the nature of their claim. The nature of their claim isn't there was a bunch of obsolete inventory at the company that was never disclosed. There was a $6 million reserve for obsolete inventory. Naturally, there was obsolete inventory. The question is, they're saying that that inventory should have been something more than $6 million. They don't say how much, but presumably a material amount, $8 million, $10 million. But they don't give any reason that our folks knew at the time they were making the judgment that it was $6 million, that it should have been a greater number. That's the key. With respect to the Coates transaction, I submit that you have at most a difference of accounting opinions. And you can see that even without respect to their expert, because BDO's sidemen, the initial auditors, approved the transaction the way it was accounted for. And when there was an auditing change, the second audit firm, Singer LUAC, came in and said, no, at this point you're going to have to make an adjustment. You're going to have to put that inventory back on the books. There was no credit memo, right? There's no credit memo, Your Honor. I'm not an accounting expert by any means, but you generally think if you return something, it's going back and off your books, you get a credit memo. Well, you have shipping documents that reflect. Well, but it also helps if you have a credit memo. It would be helpful. It would be more than helpful. It would be helpful to my case, I imagine. But I don't think it proves scienter. And again, how does it prove the scienter of the individual? On summary judgment, they don't have to prove anything. They just have to show that there's facts that raise a genuine dispute that should be resolved by a trier of fact. Your Honor, and I ---- You don't have to prove your defense. They don't have to prove anything. Nobody has to prove anything. It's not what summary judgment's about. As you pointed out in the first session, they had to come forward with facts that were significantly probative that raised a material issue. That's all I've got to do. Well, it's not. I wouldn't submit that that's a slight burden. It's not a heavy burden. It's a burden to have facts that would lead to an actual trier concluding that they were ---- that you could have a jury verdict in their favor. I think I'm over my time. Unless the panel has any other questions, I thank you for your time. Thank you, counsel. Just a couple of things. On loss causation, it is correct that the judge ---- I'm sorry. I'm still having trouble hearing. I'm sorry. On loss causation, it's correct. The judge did not make a ruling on loss causation. And, in fact, there was enough in the record anyhow to show that each time there was a negative statement, there was a stock drop. This is a company that traded on Annex, Malacom Camera, which was on NASDAQ. The cases they cited were pink sheet companies. The company had conference calls. It was followed by analysts. It followed S3s. I mean, we made a showing in the complaint, in the class motion, in the reply. There was just no question that this was an efficient market. And the effort to try to show that it wasn't, I think, was a pathetic effort to try to get class denied. And the order that they submitted, that they submitted or failed to submit, purposely occluded that as a judge's finding when, in fact, he didn't make that. May I ask you about something else? Okay. So a party's had an early meeting, agreed on a schedule, submitted to the judge, judge changes it, but you didn't complain right then. If you thought you needed more time, why didn't you go back? Well, first of all, when the judge changed the rules, he did so in violation of his own rules because the judge was required to file an order 30 days after we stipulated. He filed his order 60 days. So for two months we were under the impression that he was going to accept our stipulated judgment. The reason we didn't move initially is because we felt unless we could show him that we were making a good faith effort to try to meet the schedule, the judge would say, well, you know, you haven't shown me that you've tried to do X, Y, and Z. I'm not going to extend it unless there's that showing. And so that's really the reason why we didn't go back in a vacuum and say, we just can't do this in two and a half months. And frankly, we didn't expect the defendants to use the tactics they did to delay and stall discovery. When I stand here and I tell you that until that hard drive came two and a week before discovery, there were no e-mails. There were no relevant documents. And even the work papers were sifted through by them, sifted both with stipend and with Singer. We never got a full record. We never got the right record. And there was no reason to try this case on a firetruck. I'm not disputing the judge's discretion. Of course you do. But when it's brought to your attention that you're being prejudiced by this and that this is what's going on and you refuse to listen, then I think we're dealing with something else. All right. Thank you, Counselor. You're 45 seconds over. I just have one other question. On class certification, you know, since the PSLRA and WorldCom, whatever, and we have investors that purchased actually meeting with management, and they're still not disqualified. I mean, it's a real reach to deny class certification on mere speculation that he could have, might have. All right, Counselor, we have that argument in the briefs. So thank you very much. Huberman versus Taggart Pacific will be submitted, and we will adjourn briefly for about ten minutes and then continue with the rest of the calendar. Thank you. All right.
judges: Wardlaw, Fletcher, Paez